IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LARRY WELDON TREADWELL and | ) | Case No. 08-61627 |
| CAROLE ELAINE TREADWELL, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| LARRY WELDON TREADWELL and | ) | |
| CAROLE ELAINE TREADWELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-6058 |
| | ) | |
| GLENSTONE LODGE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| GLENSTONE LODGE, INC., | ) | |
| | ) | |
| Counter-Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY WELDON TREADWELL and | ) | |
| CAROLE ELAINE TREADWELL, | ) | |
| | ) | |
| Counter-Defendants. | ) | |

<u>MEMORANDUM OPINION</u>

Debtors Larry and Carole Treadwell filed this adversary proceeding to avoid

Plaintiff Glenstone Lodge, Inc.'s judicial lien on their home.  Glenstone Lodge filed

a Counterclaim against the Debtors, seeking a determination that the Debtors' debt to

it is nondischargeable under 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1).  For the reasons that follow, judgment will be entered in favor of the Debtors as to both the lien avoidance and the nondischargeability action.

## I.  FACTUAL BACKGROUND

Larry and Carole Treadwell are equal owners in a travel agency business known as Memory Travel.  As part of that business, Carole Treadwell organizes trips for groups of people, such as one-day bus excursions to area casinos and occasional cruises for small groups of people.  In April 2005, Carole began organizing a trip to Gatlinburg, Tennessee, which she referred to as the "Tennessee Redhatters 2006 Spring Event," which was to occur in April of the following year.  The Red Hat Society, Inc. (the "Red Hat Society") is a corporation with social chapters, primarily for women over age fifty, which organizes events and gatherings for its members around the country.  Although Carole advertised the trip to members of the Red Hat Society, and she used the corporation's logos on her advertisements and correspondence, the trip was not officially sanctioned by the Red Hat Society.[1]

---

[1]  Carole testified that, although the trip was not officially sanctioned by the Red Hat Society, she was authorized, as a member of the organization, to use its logos and trademarks, so long as nothing she advertised referred specifically to the Red Hat Society organization.

As she began to put the trip together, Carole contacted the Gatlinburg Department of Tourism in April 2005 to assist her in finding appropriate lodging and meeting space for the event. The Department of Tourism sent out a Sales Lead to hotels with facilities capable of accommodating the group, including Glenstone Lodge. After receiving the Sales Lead, Glenstone Lodge's Director of Sales at the time, Claudette Geoffrion, contacted Carole with a proposal for accommodations. Carole and Claudette communicated for the following several months as to the number of sleeping rooms and in making arrangements for various activities to occur during the weekend event.

On June 24, 2005, Claudette and Carole each signed an initial Rooms Contract for a total of 150 rooms over the course of April 20 to April 23, 2006. The Rooms Contract required Carole to pay a $250 deposit when the Contract was signed, which she paid. The Contract further required that the first night's room and tax deposit be paid when Carole submitted the rooming list (a list of rooms, with the names of the ladies staying in each room), which was due by March 31, 2006, and that the balance be paid at check-in. The trip included lodging, organized breakfasts with entertainment, a Hawaiian luau, and a 50's-style sock hop dinner banquet, all at the lodge. It also included day trips and an off-site group lunch in Gatlinburg. Carole made all of the arrangements for the lodging, food, and entertainment. The ladies

purchased the trips from Carole, selecting the type of room they wanted and the events they wished to attend. Carole stated on more than one occasion to Glenstone Lodge during the organizational process that the ladies were to book and pay for the trip through her, rather than booking and paying for their rooms individually. Carole would then pay Glenstone Lodge. The advertised trip proved to be very popular with the Red Hat ladies such that, by the time of the trip, Carole had booked approximately 429 room nights at the Lodge over the course of the long weekend of April 20 to 23.

By all accounts, the event was highly successful. The Treadwells stated at the time, and still state, that they were extremely satisfied with Glenstone Lodge's services. The Treadwells approved all charges for lodging and services at the Lodge.

Although the contract had required the Treadwells to pay a deposit for the first night's rooms three weeks prior to the event, and to pay the balance at check-in, they did not do so. In fact, the Treadwells left the Glenstone Lodge on either Sunday, April 23, or Monday, April 24, 2006, without checking out at the front desk or notifying anyone of their departure, and without paying for any of the charges, except for the initial $250 deposit. The charges totaled over $60,000.

On Monday, April 24, upon discovering that the Treadwells had left without paying the tab, Glenstone Lodge's employees immediately began attempts to contact them for payment. Carole finally responded to an e-mail on about April 26, at which

4

time Carole stated that she had turned over the bill to her bookkeeper, indicating that she would pay it after some minor adjustments were made to the bill.  Glenstone Lodge was extremely anxious for payment because it could not make its payroll that Friday without it.  On April 26, 2006, as partial payment, Carole Treadwell issued a check from the Treadwell Family Revocable Living Trust's bank account[2] to Glenstone Lodge, in the amount of $20,000, and overnighted it to the Lodge.  However, Glenstone Lodge did not receive the check the following day.  As a result, on or about April 27, Carole arranged for her bank to wire $15,000 to the Lodge, with the promise of a $5,000 check to immediately follow.  After Glenstone Lodge did not receive the promised $5,000 check, it attempted to cash the $20,000 check, but Carole had issued a stop payment on it when she wired the $15,000.

Carole testified at trial that she did not have the money to pay the bill at Glenstone Lodge.  She had collected some pre-payments and deposits from the ladies in the months prior to the event, but she had used all of that money by end of the event to pay for the entertainers, the lunch in Gatlinburg, and other costs associated with the event.  She also candidly admitted that she had used $9,850 of the deposits and prepayments for her mother's burial expenses in January 2006.  She had hoped to

---

[2] The Treadwells sometimes used an account held in the name of the Treadwell Family Revocable Living Trust to operate Memory Travel.  There was no evidence that the Trust has any assets of value.

collect enough money at the actual event, from the ladies who had not pre-paid, to pay Glenstone Lodge's bill.   However, as discussed more fully below, Carole knew long before the event that she had underestimated the costs associated with the trip, such that the price she charged the ladies for their individual bookings would not be enough to cover her costs.   Consequently, in addition to collecting payment from the ladies for this event, Carole testified that she was counting on revenues coming in from people at the Lodge booking possible future events.   As it turned out, Carole collected only about $20,000 during the actual 2006 Spring Event, which she deposited into the Treadwell Family Trust account when she returned home from Gatlinburg. Ultimately, only about $15,000 of those deposits cleared.   Those deposits were the source of the $15,000 wire to Glenstone Lodge.   She said she had to stop payment on the $20,000 check because the account did not contain sufficient funds to cover it after making the $15,000 wire transfer.   The Treadwells made no other payments to Glenstone Lodge after that wire transfer.

Glenstone Lodge sued the Treadwells and their Trust, asserting (i) fraud pursuant to § 62-7-107(b) of the Tennessee Code;[3] (ii) violations of the Tennessee Consumer Protection Act; (iii) conversion; (iv) breach of agreement; (v) fraud,

---

[3]  Section 62-7-107(b) provides that, *inter alia*, it is "prima facie evidence of intent to defraud" to procure accommodations or restaurant services by false pretense or to have procured accommodations or restaurant services and thereafter to abscond without paying or offering to pay for such accommodations.

6

promissory fraud, mail and wire fraud; and (vi) violation of various provisions of the

Tennessee Code based on the stop payment on the $20,000 check. The lawsuit prayed

for judgment in the amount of $50,000, asked that the judgment be trebled pursuant

to the Tennessee Consumer Protection Act, and sought recovery of fees and costs.

Glenstone Lodge also initially named The Red Hat Society, Inc. as a defendant in the

lawsuit, but after the Red Hat Society denied any involvement in the trip, and cross

claimed against the Treadwells, Glenstone Lodge dismissed it as a defendant.

When the Treadwells and their Trust failed to answer in the lawsuit, the

Chancery Court for Sevier County, Tennessee, entered a default judgment against

each of them in the amount of $153,611.44,[4] plus costs. Glenstone Lodge registered

its judgment in Missouri, creating a lien against the Debtors' residence. Glenstone

Lodge seeks a determination that the debt is nondischargeable under § 523(a)(2)(A),

(a)(4), and (a)(6). The Treadwells ask that the judgment lien be avoided.

## II.  GLENSTONE LODGE'S CLAIMS FOR NONDISCHARGEABILITY

## 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides that a discharge under § 727 does not discharge

an individual debtor from any debt "for money, property, services, or an extension,

renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false

---

[4] The judgment amount was treble the actual damages incurred by the Glenstone Lodge.

7

representation, or actual fraud."[5]

> Normally, exceptions to discharge are to be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code. However, the Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an honest but unfortunate debtor.[6]

Fraud may be proved by direct or circumstantial evidence, since palpable evidence of the mental state of an individual is rarely, if ever, available.[7]

### *Actual Fraud*

At the outset, Glenstone Lodge points to § 62-7-107(b) of the Tennessee Code, which formed one of the bases for the lawsuit in Tennessee, and which provides that, *inter alia*, it is "prima facie evidence of intent to defraud" to procure accommodations or restaurant services by false pretense or to have procured accommodations or restaurant services and thereafter to abscond without paying or offering to pay for such accommodations. As I stated in the Order Denying [Glenstone Lodge's] Motion for Summary Judgment, because the Tennessee Judgment did not specify on which of the pleaded theories it was based, this Court cannot apply collateral estoppel effect

---

[5]  11 U.S.C. § 523(a)(2)(A).

[6]  *Ostertag v. Overall (In re Overall)*, 248 B.R. 146, 150 (Bankr. W.D. Mo. 2000) (*quoting Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987); *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998)) (internal quotation marks omitted).

[7]  *Id.* (citations omitted).

8

to that Judgment.  Glenstone Lodge nevertheless asserts that the Treadwells' conduct falls within that statute and, therefore, it has met the burden of making a prima facie case for fraud, including the element of justifiable reliance.  However, "the issue of nondischargeability [is] a matter of federal law governed by the terms of the Bankruptcy Code."[8]   Accordingly, this Court is not bound by the Tennessee statute, and must instead look to bankruptcy law to determine whether the debt is nondischargeable for fraud.

In order to prevail on a nondischargeability cause of action for actual fraud under § 523(a)(2)(A), Glenstone Lodge must prove, by a preponderance of the evidence: (1) that the Treadwells made representations; (2) that at the time they made the representations they knew they were false; (3) that they made such representations with the intention and purpose of deceiving Glenstone Lodge; (4) that Glenstone Lodge justifiably relied on such representations; and (5) that Glenstone Lodge sustained the alleged loss and damages as a proximate result of the representation having been made.[9]

Both before and during the event, the Treadwells' communications with Glenstone Lodge were primarily with Claudette.  As a result, she was the person who

---

[8]  *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 658, 112 L.Ed 755(1991).

[9] *See In re Ophaug,* 827 F.2d 340 (8th Cir. 1987), as supplemented by *Field v. Mans*, 519 U.S. 59, 116 S. Ct. 437, 444, 133 L.Ed.2d 351 (1995).

would have had the most directly relevant conversations with the Treadwells regarding payment, but she did not testify at trial. However, as to the communications prior to the event, Glenstone Lodge produced several e-mails in which Carole and Claudette discussed the payment arrangements. Carole stated on more than one occasion that the ladies were to pay her for their individual trips and that she would then pay Glenstone Lodge. For example, in an e-mail dated May 5, 2005, Carole told Claudette not to worry about Carole's commission, that each of the ladies would make her reservation directly through Memory Travel, and that she would pay the Lodge "via one check." This, I find, was an express representation by Carole that the Treadwells would pay Glenstone Lodge for the lodging and services to be provided.

As to the representations regarding payment that the Treadwells made throughout the actual event, the undisputed testimony was that Claudette was, again, the person who dealt most directly with the Treadwells while they were at the Lodge. Although one would certainly suspect that Claudette asked the Treadwells about payment throughout the event, and that the Treadwells made numerous express representations to her about payment, since Claudette did not testify, there was no evidence of such express representations at the Lodge itself. However, two other employees of Glenstone Lodge, who were present at the Lodge and spoke with the Treadwells over the course of that weekend, Ursula House and Rita Marshall, did

10

testify at trial.    Neither of them testified that the Treadwells made an express representation about payment directly to them, personally, during the event.   However, Ms. House, who was, at the time, an assistant manager at the Lodge and was present during the Redhatters Spring Event, testified that she was aware that when anyone at the Lodge asked the Treadwells about payment, both at check-in and throughout the event, the Treadwells responded with reasons why they had not "finalized numbers," and stating that the Lodge would be paid by one check when they checked out.   Based on that, Ms. House said, the staff agreed to let them stay without prepayment.

Nevertheless, although there was no direct evidence of express representations during the event, I find that both of the Treadwells made at least implied representations, both when they took the keys at check-in and throughout the event, that they would pay the tab before leaving the Lodge, even though, as discussed below, at least Carole knew that they did not have the money to do so. "It is well established that a debtor's silence as to a material fact or when there is an affirmative duty to speak constitutes a representation for the purposes of finding fraud under § 523(a)(2)(A)."[10]    Based on the evidence, I find that the Treadwells made representations, both express (by Carole before the event) and implied (by both of

_____

[10] *Kansas Bankers Surety Co. v. Eggleston (In re Eggleston)*, 243 B.R. 365, 373 (Bankr. W.D. Mo. 2000).

them during the event), to Glenstone Lodge that they would pay the Lodge for its services.  Those representations were false.

Glenstone Lodge failed to meet its burden of proving that either of the Treadwells knew, at the time the agreement was made on June 24, 2005, that they would not be able to pay for the rooms.  Instead, based on Carole's testimony, I find that she simply underestimated many of the expenses associated with the event. Making an error in business judgment does not mean that a debtor made an intentional misrepresentation.  However, at some point prior to the event, Carole did become aware that she was not going to have funds sufficient to pay under the terms of her agreement.  Although she testified that she hoped to take in enough unpaid receipts from the ladies as they arrived at the Lodge to pay the bill, she testified that she knew, as early as October 2005, that the price she had charged the ladies for their individual trips was insufficient to cover her costs.  Specifically, Carole testified that she had grossly underestimated the cost of the entertainment, decorations, transportation, and other incidentals when she set the individual prices for the trip.  For example, she testified that she had estimated the cost of the entertainers based on an experience she had in Branson several years earlier, but the actual cost for the entertainers in Gatlinburg was double or triple what she had estimated.  Despite knowing this as early as October, Carole never mentioned to anyone at the Lodge that her receipts would not

12

cover the bill there.  In addition, she candidly testified that she spent nearly $10,000 of the money she had received on her mother's funeral expenses in January 2006. Carole testified that she also hoped to take in receipts from the ladies booking possible future events, but her stated expectation that these deposits would be sufficient to cover the $60,000 bill for the Spring Event lacks credibility.  As a result, I find that, at least by October 2005, Carole  knew full well that she would not be able to pay the bill.  From that time on, her representations that she would pay the bill were, therefore, knowingly false.

As to Larry, although it is likely that he was also aware that they did not have the money to pay the bill, there was no actual evidence of that fact.  Consequently, although I find that Larry made implied representations about payment, unlike Carole, I cannot find that his representations were knowingly false.

I further find that Carole made the representations that she would pay with the intent to deceive Glenstone Lodge.  Carole certainly knew that Glenstone Lodge would not let her check in, and would not provide her with the services for the luau, sock hop, and the breakfasts, without both a promise to pay the bill and a representation that she could pay the bill.  This is evidenced by the Lodge's policy of requiring prepayment, which Carole somehow persuaded the Lodge to waive in her case.  Indeed, Carole admitted that she was sure the Lodge thought it would  be paid

13

by the time they left.  Thus, by making the representations that she would pay for the

services, Carole intended to induce Glenstone Lodge to provide her with the services

for which she could not pay.  In addition, Glenstone Lodge was, clearly, damaged as

a result of those false representations.

However, I find that Glenstone Lodge has not demonstrated that it justifiably

relied on the misrepresentations.

> Although the plaintiff's reliance on a misrepresentation must be
> justifiable . . . this does not mean that his conduct must conform to the
> standard of a reasonable man.  Justification is a matter of the qualities
> and the characteristics of the particular plaintiff, and circumstances of the
> particular case rather than of the application of a community standard of
> conduct of all cases.[11]

Further, "a person is required to use his senses, and cannot recover if he blindly relies

upon a misrepresentation the falsity of which would be patent to him if he had utilized

his opportunity to make a cursory examination or investigation."[12]  "It is only where,

under the circumstances, the facts should be apparent to one of his knowledge and

intelligence from a cursory glance, or he has discovered something which should serve

as a warning that he is being deceived, that he is required to make an investigation of

---

[11] *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (*quoting* Restatement (Second) of Torts (1976), § 545A, Comment b).

[12] *Id.* (*quoting* Restatement (Second) of Torts (1976), § 541, Comment a;  internal quotation marks omitted).

14

his own."[13]

Glenstone Lodge is a relatively sophisticated plaintiff, as evidenced in part by its representatives who testified at trial. The Lodge's own Contract provided for payment of the first night's lodging three weeks in advance, with the balance due at check-in. Glenstone Lodge's representatives testified that this was their customary contract and there was no evidence that the Lodge had waived that requirement in any situation of this size prior to the Redhatters Spring Event. Most importantly, there was no evidence as to why the Lodge waived the requirement in this instance. Although the apparent association with the Red Hat Society may have lent some legitimacy to the Treadwells as the event's planners, there was no evidence to suggest that Carole advised the Lodge that the Red Hat Society would be responsible for, or otherwise guarantee, payment. Nor was there any evidence that the Lodge confirmed the Red Hat Society's involvement in the event. Moreover, there was no evidence that the Lodge did any sort of background or credit check on Memory Travel or the Treadwells before it permitted them to have the event without the customary prepayment.

Glenstone Lodge further alleges that its reliance was justifiable because the Treadwells appeared, from Carole's e-mails and from the Treadwells' pre-event visit

---

[13] *Id.* (*quoting* W. Prosser, *Law of Torts* § 108, p. 718 (4th ed. 1971)).

to the Lodge in January 2006, to be sophisticated and to have extensive experience as travel agents. However, based on my review of the e-mails and my observation of the Treadwells at the trial, I cannot agree with Glenstone Lodge that they present themselves as such experienced and sophisticated travel agents that absolutely no investigation or other protection of the Lodge's interests would be called for.

I recognize, as the Bankruptcy Appellate Panel did in *In re Guske*, that the standard for justifiable reliance is fairly low and that a party may justifiably rely on a misrepresentation even when it could have ascertained its falsity by conducting an investigation.[14] "However, the reliance on misrepresentations known to the victim to be false or obviously false is not justified; falsity which could have been discovered by senses during a cursory glance may not be relied upon. . . . In other words, *if there are any warning signs (i.e., obvious or known falsities) either in the documents, in the nature of the transaction, or in the debtor's conduct or statements, the creditor has not justifiably relied on his representation."*[15]

Here, the Treadwells' repeated excuses for not complying with the Lodge's contract terms for deposits and prepayment, particularly given the size of the event,

---

[14] *Guske v. Guske (In re Guske)*, 243 B.R. 359, 363 (B.A.P. 8th Cir. 2000).

[15] *Id.* at 363-64 (citations omitted) (emphasis added). *See also Waring v. Austin (In re Austin)*, 317 B.R. 525, 531 (B.A.P. 8th Cir. 2004) (the court must look at the creditor and its experience with the debtor to determine if it was justified in relying upon the debtor's statements).

should have been an obvious warning sign to the Lodge that they were not in a position to make good on their representations of payment.   It may well have been that, had Claudette, who was the employee who dealt with the Treadwells prior to and during the event, been available at trial, she would have been able to testify as to why the Lodge relied on the Treadwells' promise to pay even though they had not made the advance deposit and had not paid the remaining room balance at check-in. However, since Claudette apparently left her employment at the Lodge soon after these events, she was not available at trial.  Based on the evidence which was offered, the Lodge extended $60,000 worth of credit to the Treadwells without any investigation whatsoever of their ability to repay, and despite the fact that the Treadwells repeatedly failed, in the weeks leading up to the event,  to comply with the contract's terms regarding payment.  Glenstone Lodge had many opportunities to protect itself, but for whatever reason, it did not.  Because Glenstone Lodge presented no evidence as to why it waived the protections in its contract, and bearing in mind that Glenstone Lodge bears the burden on this issue, I find that its reliance on Carole's representations that she would pay the bill was not justifiable.   Consequently, Glenstone Lodge has not met its burden of proving each of the elements of actual fraud under § 523(a)(2)(A).

### *False Pretenses*

Although many courts have blurred the distinction between actual fraud and false pretenses, other courts have recognized a difference.[16]  In *Field v. Mans*, the Supreme Court indicated that there is such a difference because, although it decided that justifiable reliance was the standard for actual fraud, it expressly declined to decide whether the requisite level of reliance would differ in a case of false pretense or representation, but not fraud.[17]  If there were no distinction between actual fraud on the one hand, and false pretense or representation on the other, it seems to me that the Supreme Court would not have decided the reliance issue under one, but expressly declined to answer it under the others.  Consequently, I conclude that there is a distinction.

A false pretense under § 523(a)(2)(A) involves an implied misrepresentation of conduct intended to create and foster a false impression.[18]

The concept of false pretenses is especially broad.  It includes any

---

[16]  *See, e.g., In re Beza*, 310 B.R. 432, 437-38 (Bankr. W.D. Mo. 2004) (addressing false representation and false pretenses separately).  *See also In re Eggleston*, 243 B.R. 365 (Bankr. W.D. Mo. 2000) (noting that some courts have drawn the distinction, but others have not, and stating that "courts in this jurisdiction lean toward an application of the single action test of actual fraud for all claims made under § 523(a)(2)(A)."); *In re Ellingsworth*, 212 B.R. 326, 333 (Bankr. W.D. Mo. 1997) (suggesting that the three torts listed in § 523(a)(2)(A) "are all subject to the single action test of actual fraud").

[17]  516 U.S. at 71 n. 8, 116 S.Ct. at 444 n.8 ("Although we do not mean to suggest that the requisite level of reliance would differ if there should be a case of false pretense or representation but not fraud, there is no need to settle that here.").

[18]  *Merchants Nat'l Bank v. Moen,* 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).

18

intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts intended to deceive.  It is a series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongly induced by a debtor to transfer property or extend credit to the debtor.  Silence or concealment as to a material fact can constitute false pretenses. In short, false pretenses can be made in any of the ways in which ideas can be communicated.[19]

This is a case which is based on a contract entered into by Carole on behalf of Memory Travel.  That contract contained a promise to pay, and it is the breach of that promise which forms the basis of this dischargeability action.  Arguably, the conduct of both of the Treadwells may have created a false and misleading set of circumstances by which Glenstone Lodge was wrongly induced to extend credit to them.  However, since this a case that is based  on the representations contained in the contract between the parties, as well as other actual and implied representations, I question whether false pretenses would be applicable.  It is not logical to argue that false pretenses applies to circumstances where an actual or implied misrepresentation was made, but inadequate proof of reliance was offered.   In other words, false pretenses should not be used to circumvent the requirements of actual fraud simply

---

[19] *In re Gilmore*, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998) (*quoted by In re Overall*, 248 B.R. at 150) (citations and internal quotation marks omitted).

because one of the elements of actual fraud, *i.e.,* justifiable reliance, is not present. Since this case is based upon both actual and implied representations, Glenstone Lodge is obligated to prove some level of reliance on those representations.

The conclusion that Glenstone Lodge is required to demonstrate some level of reliance is supported by the Supreme Court's statement that it did "not mean to suggest that the requisite level of reliance would differ if there should be a case of false pretense or representation but not fraud." This suggests that some level of reliance is required, even in false pretenses cases. Again, however, the Supreme Court declined to answer the question of what level of reliance was required, and I found no authority subsequent to *Field v. Mans* which has answered that question. As it turns out, I need not decide that question here, either, because the justifiable reliance standard adopted in *Field v. Mans* is lower than the alternative reasonable reliance considered by the Supreme Court. For the same reasons discussed above as to actual fraud, I find that Glenstone Lodge did not justifiably rely on the Treadwells' false pretenses. Consequently, if the standard is reasonable reliance, Glenstone Lodge clearly did not meet that higher standard, either. Since I hold that Glenstone Lodge was required to prove at least that it was justified in relying on the misrepresentations as to payment, its failure to do so is fatal to any cause of action it may have had for false pretenses.

20

## 11 U.S.C. § 523(a)(4)

In order to prevail on a nondischargeability cause of action under § 523(a)(4),

Glenstone Lodge must prove that the debt was for fraud or defalcation while acting

in a fiduciary capacity, embezzlement, or larceny.  Glenstone Lodge does not assert

a fiduciary capacity existed; rather, it asserts nondischargeability under this provision

based on embezzlement or larceny.  Those grounds for nondischargeability are

described as follows:

> Embezzlement is the fraudulent appropriation of property by a person to
> whom such property has been entrusted, or into whose hands it has
> lawfully come.  It differs from larceny in the fact that the original taking
> of the property was lawful, or with the consent of the owner, while in
> larceny the felonious intent must have existed at the time of the taking.
> The required elements of embezzlement are: (1) appropriation of funds
> for the debtor's own benefit by fraudulent intent or deceit; (2) the deposit
> of the resulting funds in an account accessible only to the debtor; and (3)
> the disbursal or use of those funds without explanation of reason or
> purpose.  For purposes of section 523(a)(4) it is improper to
> automatically assume embezzlement has occurred merely because
> property is missing, since it could be missing simply because of
> noncompliance with contractual terms.
>
> Larceny is the fraudulent and wrongful taking and carrying away
> of the property of another with intent to convert the property to the
> taker's use without the consent of the owner.  As distinguished from
> embezzlement, the original taking of the property must be unlawful . . .
> .[20]

Neither embezzlement nor larceny applies here because both contemplate the

---

[20] 4 *Collier on Bankruptcy* ¶ 523.10[2] (15th ed. rev.)

wrongful appropriation or taking of another party's funds or property. Here, the Treadwells did not "take" anything tangible from Glenstone Lodge; rather, the relationship between the parties was a credit transaction whereby Glenstone Lodge provided services in exchange for payment. As a result, I find that § 523(a)(4) does not apply.

## 11 U.S.C. § 523(a)(6)

In order to prevail under § 523(a)(6), Glenstone Lodge must show that the debt was for a "willful and malicious injury" as that term is defined under bankruptcy law. Willful and malicious are two distinct requirements that Glenstone Lodge, as the party seeking to avoid the discharge of the debt, must prove by a preponderance of the evidence.[21] Willfulness is defined as headstrong and knowing conduct, and malicious is defined as conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm.[22] The Treadwells must have acted with the intent to harm Glenstone Lodge rather than merely acting intentionally in a way that resulted in harm.[23]

Even though the evidence was that Carole knew she would not be able to pay

---

[21] *In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999) (citations omitted).

[22] *Id.*

[23] *Id.*; *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998).

the bill, and the conduct was, therefore, "willful," there was no evidence at trial that either of the Treadwells intended to harm Glenstone Lodge.  Rather, the evidence was that the Treadwells intended from the beginning to host a successful event at the Lodge, and that they even hoped to have future events there.  As unrealistic as it was by the time of the event that they would be able to pay for it, there was no evidence that either of the Treadwells intended that Glenstone Lodge be harmed.  Carole simply took on an event which was larger than anything she had ever done, miscalculated the costs associated with the event, and proceeded with the hope that she would be able to raise sufficient funds at the event itself to get her out of the hole she had dug for herself.  There is no basis to conclude that she intended to harm Glenstone Lodge.

## III.  LIEN AVOIDANCE

Section 522(f)(1) provides, in relevant part, that a debtor "may avoid the fixing of a lien on an interest in property to the extent that such lien impairs an exemption to which the debtor would have been entitled . . . if such lien is . . . a judicial lien."[24] Although the parties disputed what effect, if any, a finding of nondischargeability would have on the lien avoidance issue, Glenstone Lodge has agreed that, due to the value of the Treadwells' home and the amount of the secured debt, its judgment lien would be avoidable if the debt were found to be dischargeable.  Consequently, since

---

[24]  11 U.S.C. § 522(f)(1)(A).

I have found that the debt is dischargeable, Glenstone Lodge's judicial lien on the Treadwells' home will be avoided pursuant to § 522(f)(1)(A).

## IV.  CONCLUSION

For the foregoing reasons, I find that Glenstone Lodge failed to meet its burden of proving nondischargeability under § 523(a)(2)(A), (a)(4), or (a)(6).  I further find that Glenstone Lodge's judicial lien is avoidable pursuant to § 522(f)(1)(A).  An Order in accordance with this Memorandum Opinion will be entered this date.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: 6/16/2009

Copy to: Kenneth P. Reynolds
Lee J. Viorel